JUDGE CARR;
This is a bill for the specific execution of a written contract, by which the defendant, on the 29th of July, 1812, engaged to sell and convey to the plaintiff, on or before the 1st of January, 1813, a lot at Fairfax courthouse, (particularly described in the articles;) the plaintiff to pay therefor, on the deed being executed, $250. The bill states, that the plaintiff entered into possession, and has erected expensive improvements: that at the time the deed was, by the agreement, to have been executed, the plaintiff offered to pay the purchase money, and tendered a deed to be *executed by the defendant, which he refused, and has constantly since refused, to execute. The bill prays that the *697 defendant may be decreed to convey with the usual covenants.
The defendant acknowledges the agreement set out in the bill, as also, the offer of payment and tender of the deed, stated by the plaintiff; and his refusal to accept the money or execute the deed; and he justifies his refusal on this ground: — that he was the owner of the land, on which the town of Providence, at Fairfax courthouse, was laid out: that he had built, at considerable expense, a tavern at the place: that he had constantly expressed his determination, not to sell a lot to any person who would keep a tavern on it, because this would materially injure his own: that in conversations with the plaintiff, prior to his purchase, he had stated this determination, and the plaintiff had replied, that he had no idea of keeping a tavern, and would have nothing to do with one; and that relying on this assurance, he had entered into the written agreement, without introducing into it any stipulation or condition, prohibiting the plaintiff from keeping a tavern: that when applied to for a deed, he drew one, containing such condition, and offered to execute it, which the plaintiff refused to receive: that he offered to execute an unconditional deed, if the plaintiff would bind himself in a bond, that no tavern should be kept on the lot; which he refused to do: that he has, therefore, refused to make a deed, and considers that it would be unjust to compel him to do so, without adequate security that no tavern should be kept on the lot.
The Chancellor decreed, that the defendant should execute a deed to the plaintiff, for the lot, on his paying or tendering the purchase money, with interest; and the defendant appealed.
The allegations of the defendant, on which he rests his opposition to a specific performance, being in avoidance of the bill, the burthen of proof is thrown on him; a burthen rendered peculiarly heavy, by the circumstance, that the ^plaintiff stands on the ground of a written contract, stipulating for an unconditional deed, by a particular day. The defence is supported entirely by parol evidence; and the first question is, whether that evidence is admissible against a written contract?
It is admitted on all hands, to be a general rule, equally applicable to Courts of Law' and Equity, that parol evidence is inadmissible to contradict, or substantially vary, the legal import of a written agreement. The application of this acknowledged rule, however, has occasioned great difficulty, and given rise to much'discussion; and he will have no easy task, who undertakes to reconcile all the cases; especially in equity, where certain exceptions to the rule have been admitted, out of which most of the difficulties have arisen. I do not think that I have seen this subject more ably handled any where, than in Davis v. Symonds, 1 Cox’s Ch. Cas. 402. That was a bill for the specific execution of a written contract for land. In consideration of 8001. the defendant Symonds agreed to convey the ' premises to the plaintiff and one Howell. tie conveyed them to Howell, alone; and the plaintiff filed the bill against him and Howell. One defense set up was, that though the agreement purported that Howell and Davis were joint-purchasers, yet that the real meaning of it was, that Howell should be the purchaser, and Davis was only to have an interest in the premises, by way of security for such part of the purchase money, as he should advance for Howell; and this defence, it was attempted to support, by parol evidence. Upon this point, Lord Chief Baron Eyre, after laying down generally, that parol evidence of circumstances dehors the agreement, may be admitted to raise an equity against a specific performance of it, adds, “But here, this is attempted to be carried farther, and parol evidence is offered to alter the agreement itself. Taking it so, it falls within all the rules, in which parol evidence has been held to be inadmissible. The foundation of them is in the general rules of evidence; in which, writing stands ^higher in the scale than mere parol testimony; and when treaties are reduced into writing, such writing is taken to express the ultimate sense of the parties, and is to speak for itself. Indeed, nothing is so familiar as this idea. At Nisi Prius, when an agreement is spoken of, the first question always asked is, whether the agreement is in writing? If so, there is an end of all parol evidence; for, when the parties express their meaning with solemnity, this is very proper to be taken as the final sense of the agreement. In the case of a contract respecting land, this general idea receives weight from the circumstance, that you cannot contract at all on that subject, but in writing; and this, therefore, is a farther reason for rejecting the parol evidence. In this way only is the statute of frauds material; for, the foundation and bottom of the objection is in the general rules of evidence. I take this rule to apply in every case, where the question is, what is the agreement? And this rule applies no farther than this precise question; for, as often as the question is, what are the collateral circumstances attending the agreement, so often may such collateral circumstances be proved by parol evidence.” The Chief Baron further exemplifies his idea of this distinction, by letting in this very evidence upon another point of the defence, to wit, whether upon all the circumstances of the case, a specific execution should be decreed. Fraud, mistake, or surprise, in the execution of a contract, deed, or other writing, may be shewn by parol testimony. The books áre full of cases, shewing both the general rule, and the exceptions. The Marquis of Townshend v. Stangroom, 6 Ves. 328; Lord Irnham v. Child, 1 Bro. Ch. Cas. 92; Lord Portmore v. Morris, 2 Bro. Ch. Cas. 219; Filmer v. Gott, 7 Bro. Parl. Cas. 70: Rich v. Jackson, 4 Bro. Ch. Cas. 514; also in 6 Ves. 334, note (c.); Patrick v. Pawlett, 2 Atk. 383; Lord Milton v. Edgworth, 6 Bro. Parl. Cas. 587; Hare v. Sherwood, 3 Bro. Ch. Cas. 168; Foot v. Salway, 2 Ch. Cas. 142; Joynes v. Statham, 3 Atk. 388; Clark v. Grant, 14 Ves. 519; Higginson v. Clowes, *15 Ves. 516; Clowes v. Higginson, 1 Ves. & Beam. 524. In this last case, the distinctions are so clearly *698 laid down by the Vice Chancellor, that it may not be amiss to quote a few sentences. “The exclusion of parol evidence, offered to explain, add to, or in some way to vary, a written contract relative to land, stands upon two distinct grounds; not simply as being in direct opposition to the statute of -frauds, but also upon the general rule of evidence, independent of that statute. The writing must speak for itself, and can receive no aid from extrinsic evidence, of this more loose and dissatisfactory nature. That which is the rule of Law, prevails equally in Courts of Equity; which admit no different rule of evidence on this subject; and thus far the rule is perfectly clear, rejecting parol evidence- offered by the plaintiff to constitute, vary, or explain, a contract in writing concerning land, of which he seeks the specific performance in a Court of Equity.- The difficulty is, how far evidence is admissible, offered as a 'defence against a bill praying a specific performance. Upon that, there undoubtedly are many cases, where the evidence has been received; and without enumerating the authorities, it may clearly be admitted for that purpose, upon a plain and obvious principle; that a Court of Equity is not bound to interpose by specifically performing the contract; and though the subject and import of the written contract -are clear, so that there is no necessity to resort to evidence for its construction; yet, if the defendant can shew any circumstance dehors, independent of the writing, making it inequitable to interpose .for the purpose of a specific performance, a Court of Equity having satisfactory information upon that subject, will not interpose. The rule admitting evidence, in these cases, is intelligible and clear. It 'is admitted, not- to- vary an agreement, as it is expressed, open to no objection, and therefore, upon the letter, binding; but to shew circumstances of fraud, making it unconscientious in the party to" insist upon, and unjust in the Court to decree, the performance. Fraud is not the only *head upon which parol evidence may be received; and if made out satisfactorily, specific performance may be refused. Upon clear evidence of mistake or surprise, that ¿he parties did not understand each other, it is introduced, not to explain or alter the agreement, but, consistently with its terms, to shew circumstances of mistake or surprise, making a specific performance, as in the case of fraud, unjust; and therefore, not conformable to the principles upon which a Court of Equity exercises this jurisdiction. There is, however, considerable difficulty in the application of evidence under this head; calling for great caution, (especially on sales by auction,) lest, under this idea of introducing evidence of mistake, the rule should be relaxed by letting it in to explain, alter, contradict, and in effect, get rid of, a written agreement.”
Having thus attempted to state the law upon the subject, let us consider the facts in the case; and' this we will do under three points of view. 1st. What passed before the contract. 2nd. The contract itself. 3rd. The circumstances dehors the contract, relied on to shew, that upon the whole case, the Court ought not to decree a specific execution.
It is stated in the defendant’s answer, and he has been at great pains to prove by many witnesses, that he said in various conversations, that he would not sell lots, without a provision against the purchaser’s keeping a tavern. He alleges also, in his answer, that previous to his sale to the plaintiff, he stated this determination in conversations with him; and that the plaintiff promised that if he should be a purchaser, he would keep no tavern; and he has proved by several witnesses, that the plaintiff, some time after the contract, acknowledged that these conversations had passed, and these promises been made. If these previous statements, conversations and promises, are introduced to contradict or vary in any manner, the subsequent written contract, they are inadmissible; as all the cases I have quoted shew. Their admission, to influence the contract, would violate another well settled rule;— that where an agreement *is reduced to writing, all previous negotiations and treaties, whether written or resting in parol, are extinguished, and cannot be resorted to, to help out or explain its meaning. Vin. Abr. 515, pl. 18; 517, pl. 26; 2 Caines’ Rep. 155; 1 Johns. Rep. 414; 1 Johns. Ch. Rep. 282. Whether these previous communications have any weight in the general question of specific performance, or not, we will consider when we come to that point.
Let us look now at the agreement. It is dated on the 29th of July, 1812, and explicitly states, that it is agreed on by Richard Ratcliffe to sell and convey to Allison, on or before the 1st of January next, six poles, &c. for which said Allison is to pay, on the deed therefor being executed by said Ratcliffe, $250; no' condition, no restriction or reservation, annexed. Nor does the defendant, in his answer, charge that there was fraud, accident or surprise, in the drawing or executing this .agreement. It is stated in the record to be drawn by himself. Under this contract, the plaintiff has entered into possession, held the lot ever since, (13 years,) made expensive improvements, and now asks a specific execution. Shall we give it to him? Shall we direct a quantum damnificatus? Or shall we dismiss-his bill? I apprehend that there is no other course which we can pursue. The defendant, to be sure, has proposed to execute a deed, with a condition against keeping a tavern; but this the plaintiff has refused. If we say he shall accept such a deed, we introduce a new term into the contract. Instead of executing the contract the parties have made, we make a new one for .them; a power which Courts of Equity never professed to exercise, and I trust, never will. An issue quantum damnificatus would, in my opinion, be suited, neither to the case, the views of the plaintiff, nor to the situation in which the contract has placed him. If we dismiss the bill, the plaintiff loses his lot and improvements, and is left to the dubious and inadequate remedy of a suit at law for dam *699 ages. Yet to one of these courses, we must leave him, if, upon all the circumstances *of the case, we shall find that it would be unjust to decree a specific execution. And here all the parol evidence is admissible; for we have seen that it may properly be resorted to, for circumstances dehors, and collateral to, the agreement. It is relied on as a strong circumstance against a specific execution, that it would enable the plaintiff to erect a rival tavern, to the great injury of that owned by the defendant; an injury which the defendant never meant to hazard, by the sale of the lot; which is considered as proved by the general declarations of the defendant, his conversations with the plaintiff, held previous to the contract; and the plaintiff’s promises. Eet us examine this.
The defendant, being owner of the land a Fairfax court house, has an act of Assembly passed, and his land laid off into lots, for a town. He might either keep all these lots himself, or sell them. This was a matter for his own decision. He built a tavern, and wished to monopolize, either in his own hands, or those of his tenants, the profits of this trade; to have no rival tavern at the place. This end was to be effected, either by retaining the ownership of all the lots, or selling them out, with an express condition, restraining the purchasers from keeping a tavern. This condition, though I suppose a legal one, would not be considered as of that class particularly favoured by the Courts. In any contract for the sale of the lots, they would leave this condition to stand precisely on the ground on which the parties placed it, provided the contract was fair. In the case before us, the defendant sold to the plaintiff a lot, without including in the contract any restraining condition. There is no fraud, no surprise, no mistake, in the contract. The defendant himself tells us the reason why he omitted to insert such a condition. He says, that before he sold the lot to the plaintiff, he had a conversation with him, in which he promised that if he bought he would not keep a tavern: that he made en-quiries into the plaintiff’s character, and after this, entered into the written ’•'contract, and did not insert the condition; relying on the promises of 1he plaintiff. Thus he has deliberately chosen his ground. He has bound himself 1o make the plaintiff an unconditional deed fr"- the lot, by a given day; and to rest for his security on the promise of the plaintiff not to keep a tavern. When the plaintiff comes with this contract in his hand, and asks a Court of Equity to give him the effect of it, on what ground shall he be refused? Is the contract unjust, unfair? Has the plaintiff misbehaved, are his hands unclean, has he done iniquity? Why then shall he not have equity? Is the equity he asks, rebutted by the consideration, that the defendant has no security against the keeping of a tavern, but the plaintiff’s promise; and if we decree him a deed, he may hereafter break that promise? Surely not. The defendant knew this, when he sold the lot. He chose to rely on the promise, instead of the written contract. The promise has not, in the course of 13 years, been broken; and we have no reason to believe that it ever will; for, I will not consider it as a reason (though it seems to have been greatly relied on by the defendant,) that the plaintiff or his store-keepers sometimes treated their customers with crackers and cheese. Again. It is contended, that the price at which the lot sold, proves that there was a condition understood, against keeping a tavern; and many witnesses are interrogated (by questions leading to, and grossly suggestive of, the answers wished,— the mode pursued by the defendant through the whole record,) whether they do not think that the defendant could have gotten more than $350 for the lot, if he would have sold unconditionally. Mere opinions on a subject of this sort, thus obtained, seem to me to deserve very little weight. The defendant has not chosen to exhibit to us, a general list of his sales of lots. This would have given us fact, instead of opinion. It would have shewn us too, whether those other lots were sold with a restraining condition; for, though the defendant has proved by many witnesses, his declarations, that he would not sell without such condition, *he has not proved a single sale made in that way. He has not produced a single deed containing such condition. The plaintiff, indeed, has brought before us one deed for a lot sold, after the one to him, but in the same year. This lot was only a pole smaller than his in front, and not very far from it. It was sold without any restraining condition, and for $100 only. Richardson, a witness, who is examined as to the relative value of these lots, says, that if they were of a size, he should think the plaintiff’s lot worth more than double the other. We see that it sold for $50 more than double. I consider this the only evidence of any worth before us, either as to the value of the lots, or the conditions under which they were actually sold; and this evidence by no means supports the declarations of the defendant, or the opinions of his witnesses.
Upon the whole, I am clearly of opinion, that the Chancellor’s decree is right, and ought to be affirmed.
JUDGE COAETER:
It seems to me, that the nature of the transaction between the plaintiff and defendant, was this; — that the defendant sold the lot to the plaintiff, informing him, in a previous conversation, (and which seems, by the statements of both parties, to have been in their contemplation, when the writing was entered into,) either that the plaintiff and his brothers should not keep a tavern, or that during all' time, no tavern was to be kept there; but which of these, is not so apparent. It would rather seem, the former, as the defendant was willing to convey on an assurance that none should be kept for 7 years. No stipulation, however, was put in the writing. On the contrary, the answer and the testimony both concur, that it was not put in, because the defendant relied on the promises of the plaintiff; believing, on enquiry as to his character and pursuits, that he was safe in. so' relying; and, therefore, it was not put *700 into the writing. Had he proposed to impose a perpetual restriction, (and if that was intended, surely it ought to *have been in the writing,) it might have broken off the contract, and prevented a man of’ capital from settling at, and improving, the place. No Court, I suppose, would carry such a contract, restricting the free use of property, beyond the clear and explicit agreement of the parties. A witness proves, that the plaintiff said he would not have a deed with such restriction, as he might want to sell; and had it been proposed, doubtless it would' have broken off the contract. But the defendant wished to- carry it even farther; — ■ that no boarding-house or livery stable should be erected. Surely this was not within the contract. If the plaintiff or his agents violated the law, as to restricting, &c. he or they were punishable under the law.
If we could, therefore, set this'up as a part of the agreement, as a condition on which the deed was to be made, we could not carry it farther than that the plaintiff or his brothers should not keep a tavern, and could not intend it to extend to his alienees, even during his or his brothers’ lives.
But it seems to me, that’ this was, at most, a parol stipulation, for the breach of which, an action would lie on that stipulation,, be it what it may; and for which breach, the plaintiff would be personally liable; and that it was not intended as' a covenant running with the land, and to bind if in whosever hands it came; and that, therefore, we have no more to do with it, than if the deed had been made an absolute one, with a memorandum on it, that such ■deed was not to be considered as a waiver of the parol contract between the parties, that the plaintiff was not to keep a tavern.
My only doubt, therefore, about the decree, is, whether it ought not to have been without prejudice to any claim to' redress, which the appellant might have, in case there was such an agreement as is insisted on, and it should be violated. But the other Judges thinking the decree will not preclude such remedy, I am for affirming it.
The PRESIDENT:
The understanding between the parties, which is sometimes called a promise, that neither the plaintiff nor his *brother would keep a tavern on the lot sold by the defendant, which is insisted on in the answer as an objection to the specific execution of the written contract, was not intended by either party to be put into the contract; nor is it pretended that there was any fraud, mistake, or surprise, in the execution of it, that would bring it within the case of the Marquis of Townshend v. Stangroom, 6 Ves. 328, relied on by the counsel for the defendant. That the defendant’s reliance on the understanding, that no tavern was to be kept on the lot, by the plaintiff or his brother, was a motive for signing the contract, is probable; but the stronger motive seems to have been, that upon enquiry into the character and pursuits of the plaintiff, he was willing to rely on that and his promise, that no rival tavern would be kept on the lot, either by himself or his brother. The promise was evidently personal. If it was intended as a perpetual restriction on the enjoyment of the property, it would certainly have been inserted in the written contract, or it would have been ineffectual against subsequent purchasers, without notice. The agreement was not signed, therefore, in consequence of the promise; and there is no fraud in the plaintiff, in insisting on the specific execution of the articles; as in the case of Clark v. Grant, 14 Ves. 519, also relied on by the counsel for the defendant. "If more specifically proved than it is, it might be the ground of an independent action for damages; and in such case, if it was clearly shewn, that on the breach of it, any other recourse against the plaintiff would be ineffectual, though it would not rebut the equity of the plaintiff, it would be a ground for the Court to put 'him on terms.
The decree, therefore, I think, is correct, and ought to be affirmed.
Decree affirmed.*